OPINION OF THE COURT
Sabrina B. Kraus, J.
Background
These consolidated summary proceedings were commenced by SITC Inc. (petitioner) who seeks to be restored to possession of apartments 2902, 1019, 1420 and 2929 at 1 River Place, New York, New York 10036 (subject premises) based on allegations that Riverplace I Holdings LLC (respondent), the landlord and owner of the subject premises had illegally locked petitioner out of possession. The proceedings were initiated by order to show cause on December 18, 2008. They were consolidated for joint determination on consent of both parties on the return date.[1] A hearing was held on December 19, 2008, after which the court ruled that petitioner had been wrongfully ousted of possession, but reserved decision on the issue of petitioner’s request to be restored to possession.
Facts
Petitioner is the tenant of record for 20 rent-stabilized apartments at the subject building, pursuant to written lease agreements and riders. All of the applicable lease agreements for the subject premises have expired, and have not since been renewed.
The leases executed between the parties were standard form of apartment leases, issued by the Real Estate Board of New York, form number A1/88/A.
Article 1 of the leases provides that the subject premises shall be used for living purposes only, and only by petitioner or its immediate family. Article 1 is supplemented by a rider to the leases, which provides in article 33 that only petitioner, its immediate family members, and persons authorized to occupy the premises pursuant to Real Property Law § 235-f may occupy the *221 subject premises. Article 33 further provides a space to list the identity of the occupants, which is left blank. Article 33 (B) of the rider provides that the subject premises shall be occupied by petitioner and its customers.
The leases also have annexed a corporate occupancy rider, which provides that petitioner shall designate the party who shall be the initial occupant of the subject premises to respondent, that petitioner shall have the right to designate up to four other parties to occupy the subject premises upon said notice, and that petitioner may not permit anyone to occupy without such notice.
Article 16 of the leases contains the usual proscriptions against subletting and assignment.
Article 17 (3) of the leases provides that if petitioner defaults in the payment of rent, after a personal demand for rent has been made, or within three days after a statutory demand for rent has been made, or if the lease ends, respondent may reenter the subject premises and take possession, if petitioner has moved out.
The leases were executed by David Drake, also known as David Drakeburg, on behalf of petitioner, who testified that he is the owner petitioner. Mr. Drake runs a company that appears to offer short-term housing to its clients, and was apparently using the subject premises for that purpose.
Mr. Drake testified that petitioner rented apartments for corporate clients who required furnished apartments. Mr. Drake referred to all occupants as his “clients.” He acknowledged familiarity with a corporate entity known as Drake Corporate Relocation. Mr. Drake testified that he was related to that entity, and that Drake Corporate Relocation leases apartments from petitioner.
Mr. Drake testified that the subject premises were not advertised for rental on the Internet, and that they were not rented as hotel units. Mr. Drake testified that as far as he was aware, none of the occupants were charged hotel tax. Mr. Drake’s testimony was evasive and not credible.
Notably in one e-mail correspondence offered into evidence, Elinor McMurtrie, “Operations Coordinator” for “Drake Corporate Housing” sent an e-mail, in reference to two apartments rented by petitioner in the subject building, which read “Please disconnect service for these two apartments as we no longer manage them.”
*222 Mr. Drake did not personally attempt to gain access to the subject premises. However, the parties stipulated that on December 4, 2008, respondent changed the method of access to the subject premises, petitioner was no longer able to gain access on that day, and an agent of petitioner did attempt to gain access on that day. The keys and locks for the subject premises are issued through an “FOB” system. The system is an electronic key system. Each key is similar to a credit card, it contains an internal chip, that can be disengaged at any time, by respondent, through the computer system.
At the time the keys were disengaged, no one was in physical occupancy of the subject premises. The leases had all expired, and while respondent had sent renewals out, petitioner had not executed or returned any of the renewal leases.
Respondent’s agent, Katherine McGrath, testified that petitioner had not paid rent on any units since January 2008, and that in January 2008, petitioner paid one month’s rent on each unit. However, respondent’s exhibit D in evidence, which is a rent history for each of the units, indicates a somewhat different payment history, as far as the last payment acknowledged received.
For unit 1019, petitioner last had a zero balance in October 2006, and last made a payment in May 2008.[2] The monthly rent is $3,425. Pursuant to the rent history and including the months of August 2008 through December 2008 there appears to be $44,425 in unpaid rent arrears through December 2008.
For unit 1420, petitioner last had a zero balance, exclusive of late charges, in January 2007. The last payment acknowledged received was in May 2008, which was the second of two payments acknowledged in 2008, the first was made in February 2008. The monthly rent for the unit is $2,745. Pursuant to the rent history there appears to be $32,650 due in arrears through December 2008.
For unit 2902, petitioner last had a zero balance in June 2007. The last payment made by petitioner was in May 2008. The monthly rent is $2,300 and there appears to be $32,200 in arrears through December 2008.
*223 For unit 2929, petitioner last had a zero balance in January 2007. The last payment acknowledged received was in May 2008, which was the second of two payments acknowledged in 2008, the first was made February 2008. The monthly rent is $2,190, and there appears to be $26,280 in arrears through December 2008.
Ms. McGrath also testified that no payments had been made for any of the units, after the expiration of the lease for said units, which does appear to conform to the leases and rent history in evidence.
At or about December 2007, petitioner started experiencing financial difficulties, and the parties from December 2007 forward had negotiated surrenders of some of the 20 units that petitioner had originally rented. No surrender was tendered or negotiated for the subject premises. The record does not establish that respondent took any action to terminate the tenancies by issuing a notice of nonrenewal, issuing a rent demand[3] or otherwise seeking to terminate the tenancies.
Ms. McGrath testified that respondent believed petitioner had abandoned the subject premises. However, other than the reference to negotiated surrenders of other units, respondent offered no evidence to support this claim. For example, although both parties agree that the subject premises were not occupied on December 4, 2008, there was no evidence as to the last date the subject premises were occupied, or specifying what, if any, possessions belonging to petitioner remained in any particular unit as of December 4, 2008.
Conclusions of Law
It seems clear to this court that respondent had no legal right to unilaterally change the locks of the subject premises on December 4, 2008. Petitioner had not surrendered the units, and its tenancy had not otherwise been terminated. Moreover, the tenancies were subject to rent stabilization, and thus did not necessarily terminate with the expiration of the lease.
Administrative Code of the City of New York § 26-521 (a) (3) provides that it is unlawful to evict an occupant lawfully in possession of a dwelling unit without a court order, by changing the lock to the entrance of the unit and failing to provide the occupant with a key. This is precisely what occurred in this case.
*224 Remedies available to an occupant under these circumstances include a summary proceeding to be restored to possession pursuant to RPAPL 713 (10) and an action for treble damages pursuant to RPAPL 853.
However, the court finds that in light of the particular circumstances of this proceeding, restoration of petitioner to the subject premises is neither equitable nor appropriate. Three considerations lead the court to this conclusion. The first is that the premises were rented for the sole purpose of reletting to short-term occupants for financial gain, and this use is in direct contravention of the Rent Stabilization Law. The second is that the eviction was accomplished without use of force, and did not displace any individual using the premises for living purposes. The third is the body of case law holding that restoration may not be appropriate where the tenant would be subject to eviction anyway. Behind each of these considerations there is legal authority supporting the conclusion that petitioner should not be restored to possession.
Petitioner is an Illusory Tenant Who Rented the Subject Premises for the Sole Purpose of Subletting to Short-Term Occupants for Financial Gain
It was undisputed at the hearing that petitioner rented 20 units in the subject building, not for living purposes of any particular occupant, but solely to place short-term occupants in possession, which was a business use from which petitioner made a profit. The record was not clearly developed as to how much petitioner charged these short-term occupants; however, the record was sufficiently developed for the court to determine that petitioner rented these units for the sole purpose of reletting them to short-term occupants for financial gain.
Respondent argues that pursuant to Matter of Partnership 92 LP & Bldg. Mgt. Co., Inc. v State of N.Y. Div. of Hous. & Community Renewal (46 AD3d 425 [1st Dept 2007]), petitioner is an illusory tenant and the leases between the parties are thus void ab initio.
The court agrees that petitioner’s tenancy does appear to fall squarely within the definition of an illusory tenancy. In Partnership 92 LP, the Appellate Division held the tenancy to be illusory, where the lessee never occupied the apartment, but instead rented it solely for the purpose of re-leasing it, at a profit, to corporate entities to use as temporary housing for their employees. In Partnership 92 LP, as in this case, the ten *225 ant who rented the apartment was listed as the tenant of record for more than one rent-stabilized apartment in the building.
“An illusory tenancy is defined generally as a residential leasehold created in a person who does not occupy the premises for his or her own residential use and subleases it for profit” (Matter of Badem Bldgs, v Abrams, 70 NY2d 45, 52-53 [1987]). The Court of Appeals further held “[s]uch tenancies are condemned because they permit the unscrupulous to use the provisions of the rent stabilization laws for financial gain, at the expense of those entitled to the laws’ protections to obtain living quarters at reasonable cost, and thereby frustrate the laws’ purposes.” (Id. at 53.)
Moreover, while the tenant in Partnership 92 LP was an individual, the doctrine of illusory tenancy has been held applicable to corporate tenants as well (see Art Omi, Inc. v Vallejos, 21 Misc 3d 129[A], 2008 NY Slip Op 52012[U] [2008] [not-for-profit organization never occupied premises and leased for purpose of reletting as temporary housing was illusory tenant]).
In this case, petitioner leased the subject premises purely for the purpose of making a profit, as part of its general business to provide temporary housing to its clients. Additionally, respondent was clearly aware of and acquiesced in this intended use. While the record is devoid of any details regarding how much the subject premises were sublet for, the presumption that petitioner relet for a profit is supported by the circumstances surrounding the tenancies, the leases themselves, which never specified any particular occupants, Mr. Drake’s evasive testimony at the underlying hearing, as well as the acknowledged nature of petitioner’s business.
The court finds that the use of the subject premises in contravention of the basic purpose of the Rent Stabilization Law, weighs against petitioner’s request to be restored to possession.
The Eviction Was Accomplished without the Use of Force and No Individual Occupant Was Displaced from the Subject Premises
While limited primarily to commercial tenancies, the doctrine of common-law self-help, when used peacefully, remains recognized as valid. Authorities continue to hold that the common-law remedy of reentry, where expressly reserved in a lease, has not been abrogated by statute (see Matter of 110-45 *226 Queens Blvd. Garage v Park Briar Owners, 265 AD2d 415 [2d Dept 1999], revg 177 Misc 2d 555 [1998]).
In this case, it is undisputed that no force was used in the self-help eviction accomplished by respondent. Additionally, while self-help evictions are generally not sanctioned, in the case of residential tenancies, this tenancy had many characteristics of a commercial tenancy. Furthermore, no individual who was or claimed to be using the subject premises for living purposes was displaced as a result of respondent’s self-help eviction.
Moreover, there is some authority allowing this type of self-help eviction even as against residential occupants who are not tenants (see e.g. Almonte v City of New York, 166 Misc 2d 376, 377 [App Term, 2d Dept 1995], citing P & A Bros. v City of N.Y. Dept. of Parks & Recreation, 184 AD2d 267 [1992] and Paulino v Wright, 210 AD2d 171 [1994]).
The leases, in this case, do contain applicable language regarding reentry by the landlord. Article 17 (3) of the leases provides
“[i]f you do not pay your rent when this Lease requires after a personal demand for rent has been made, or within three days after a statutory written agreement for rent has been made, or if the Lease ends, Owner may do the following: (a) enter the apartment and retake possession of it if you have moved out . . . .”
In this case it cannot be said that petitioner had moved out. Nor, despite the prolonged and acknowledged default in the payment of rent, was there any detailed evidence offered of a statutory or personal rent demand ever having been made.
However, given the other issues taken into consideration, and limited to the specific facts of this case, the court finds that the peaceful self-help eviction, which affected no individual using the premises for living purposes, supports denial of petitioner’s request to be restored to possession.
Legal Authority Supports Denial of Restoration to Possession Even Where the Eviction Was Unlawful Where Restoration Would Be Futile
There are several cases where courts have found evictions to be unlawful, but still declined to restore the evicted tenant or occupant to possession. Generally, the reasoning behind such holdings is that restoration to possession may be futile because the person or entity would be subject to eviction anyway. In *227 such cases, courts have often limited the occupant to money damages for the wrongful eviction.
In Soukouna v 365 Canal Corp. (11 Misc 3d 137[A], 2006 NY Slip Op 50522[U] [App Term, 1st Dept 2006]) the trial court found that there was strong evidence establishing that the use of the premises was illegal, but directed that the tenant be restored to possession since the landlord had used self-help rather than commencing a summary proceeding. The Appellate Term modified the trial court’s decision by declining to restore the tenant to possession (id.). The Appellate Division, affirmed the determination not to restore the tenant to possession, holding that while the tenant was appropriately awarded damages for the unlawful eviction, it would be futile to restore the tenant to possession because the tenant had been using the premises for illegal purposes and “a summary proceeding brought by respondent would result in petitioner’s certain eviction.” (Soukouna v 365 Canal Corp., 48 AD3d 359 [1st Dept 2008].)
Similarly, in Wagman v Smith (161 AD2d 704 [2d Dept 1990]) the Appellate Division held that even though the owner should have sought a writ of assistance to evict the occupant, rather than just change the locks, there was no need to restore respondent to possession simply to be subject to eviction after a writ of assistance was obtained and executed (see also Brown v 165 Conover Assoc., 5 Misc 3d 128[A], 2004 NY Slip Op 51244[U] [App Term, 2d Dept 2004] [licensee not claiming tenancy rights should not be restored to possession after death of tenant and expiration of license]; Bernstein v Rozenbaum, 20 Misc 3d 138[A], 2008 NY Slip Op 51558[U] [App Term, 2d Dept 2008]).
In this case, there are certainly grounds upon which respondent could have proceeded to legally evict petitioner. Respondent could have commenced an action for nonpayment of rent. Respondent could have served petitioner with notices of nonrenewal during the Golub period based on nonprimary residence. Respondent did neither, and in fact sent petitioner offers of renewal which were never executed and returned by petitioner. However, given the court’s finding that the underlying tenancies are illusory tenancies in violation of the Rent Stabilization Law, as well as in consideration of the other issues discussed above, the court holds that restoration to possession would be improper, despite the illegality of the underlying eviction. Petitioner should be relegated to an action for monetary damages.
*228 Conclusion
Based on the forgoing, the court finds that petitioner did establish by a preponderance of the evidence that respondent unlawfully evicted petitioner without due process by unilaterally changing the locks to the subject premises on December 4, 2008. However, for the reasons stated above, the court declines to restore petitioner to possession of the subject premises and finds instead that petitioner should be limited to monetary damages as a result of said eviction. Petitioner, if so advised, may seek such damages in a separate plenary action.

. Also consolidated for joint determination was index No. 97481/08. However, the court has issued a separate decision as to said proceeding as in that proceeding, petitioner’s lease had not yet expired.

. Respondent’s exhibit D is rent histories. The document does not provide the rent history through the date of trial but ends between May 2008 through August 2008, depending on the unit. Since petitioner offered no evidence to contradict Ms. McGrath’s testimony, the court presumes that no payments were made after the end dates of the histories provided.

. Ms. McGrath did testify generally that rent demands were made, but no evidence or testimony was offered regarding specific rent demands for the subject premises.